✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED
4:18 pm, Sep 18 2026
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY JK Deputy

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**IN THE MATTER OF THE SEIZURE OF ALL USDT TOKENS HELD IN THE CRYPTOCURRENCY WALLET ADDRESS IDENTIFIED BY:**

TTACZx1BQEj2wVhXdKe6zGorKqS1EjE72A
TJA2KjVzL2ixWQzci7Zr8zMzouWtHJo9pz
TWgzbUbt8g4ZnFHh7mjnuR4d8f5HzSdDUF
TDJkmbe8NrWw2wuhdhQEfyLJvvpmGksZWi
TB7rxSjL7cTfJyQeddcmubhSt7goVW7PH6
TPo1J3QdoL3PbWpnZXXGav8nGiQEyCAAKg
TRBDo4QmH31jtFntNAb7aHvSsmm67QD422

**Case No.** 1:26-mj-01873-CJC

**AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT**

I, Special Agent James Maskell, being duly sworn, depose and state:

**INTRODUCTION AND AGENT'S BACKGROUND**

1. I am "an investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since December 5, 2021. I am currently assigned to the Baltimore Division of the FBI, Complex Financial Crimes Squad. In this capacity, I am charged with investigating possible violations of federal criminal law, specifically those involved with white-collar crimes. Through the course of my employment, I have participated in numerous criminal investigations

involving financial crimes and recently spent approximately four months receiving training on criminal investigations at the FBI Academy in Quantico, Virginia. I have participated in the execution of numerous federal search and seizure warrants. I perform and have performed a variety of investigative tasks, including the identification and collection of computer related evidence.

4. This affidavit is made in support of an application for a warrant authorizing the seizure of the USDT tokens associated with the virtual currency addresses "TTACZx1BQEj2wVhXdKe6zGorKqS1EjE72A" (hereinafter, **TARGET ADDRESS** 1), "TJA2KjVzL2ixWQzci7Zr8zMzouWtHJo9pz" (hereinafter, **TARGET ADDRESS** 2), "TWgzbUbt8g4ZnFHh7mjnuR4d8f5HzSdDUF" (hereinafter, **TARGET ADDRESS** 3), "TDJkmbe8NrWw2wuhdhQEfyLJvvpmGksZWi" (hereinafter, **TARGET ADDRESS** 4), "TB7rxSjL7cTfJyQeddcmubhSt7goVW7PH6" (hereinafter, **TARGET ADDRESS** 5), "TPo1J3QdoL3PbWpnZXXGav8nGiQEyCAAKg" (hereinafter, **TARGET ADDRESS** 6), "TRBDo4QmH31jtFntNAb7aHvSsmm67QD422" (hereinafter, **TARGET ADDRESS** 7), and collectively (hereinafter, **THE TARGET ADDRESSES**) as proceeds of or involved in violations of, 18 U.S.C. §§ 1343 (wire fraud) and 1956(a)(1)(B)(i) (money laundering), and therefore subject to criminal and civil forfeiture.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrants to seize the funds in the **TARGET ADDRESSES** because they are proceeds of wire fraud, in violation of 18 U.S.C. § 1343, and/or involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (together the "Subject Offenses"), and as such is subject to criminal and civil forfeiture, pursuant to 18 U.S.C. § 982(a)(1) and (2) (criminal forfeiture), and 18 U.S.C. § 981(a)(1)(A) and (C) and 28 U.S.C. § 2461(c) (civil forfeiture).

## APPLICABLE LAW

6. This Court has jurisdiction to issue the requested warrant to seize the funds in the **TARGET ADDRESSES** because they are proceeds of wire fraud, in violation of 18 U.S.C. § 1343, and/or involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (together, the "Subject Offenses"), and as such are subject to criminal and civil forfeiture, pursuant to 18 U.S.C. § 982(a)(1) and (2) (criminal forfeiture), and 18 U.S.C. § 981(a)(1)(A) and (C) and 28 U.S.C. § 2461(c) (civil forfeiture).

7. Title 18, United States Code, Section 1343 (wire fraud) provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," shall be guilty of a federal offense.

8. Title 18, United States Code, Section 1956(a)(1)(B)(i) (laundering of monetary instruments with intent to conceal) provides that "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" shall be guilty of a federal offense. Wire fraud is a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1).

9. The proceeds of wire fraud are subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which

1:26-mj-01873-CJC

constitutes or is derived from proceeds traceable to wire fraud is subject to civil forfeiture. In addition, 28 U.S.C. § 2461(c) provides that "if a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized," then the government can obtain a forfeiture of property "as part of the sentence in the criminal case." Thus, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to criminal forfeiture.

10. Property involved in a money laundering offense is subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to civil forfeiture. In addition, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to criminal forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime. These forfeitures encompass all property "involved in" the crime, which includes the actual property laundered and property used to facilitate the laundering offense. *See United States v. McKinney*, No. 07-0113-01 (RBW), 2009 WL 10701319 at *7 (D.D.C. Mar. 26, 2009) ("property that may be used to facilitate a money laundering violation includes money in financial accounts, personal property, real property, and businesses"); *see also United States v. Wyly,* 193 F.3d 289, 302 (5th Cir. 1999) (explaining that untainted funds that are comingled with tainted funds derived from illicit sources may constitute a facilitating property).

11. This application seeks a seizure warrant under both civil and criminal authority because the property to be seized could otherwise be placed beyond the government's reach.

Pursuant to 18 U.S.C. § 981(b), property subject to civil forfeiture may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement," if there is probable cause to believe that the property is subject to forfeiture. Pursuant to 28 U.S.C. § 1355(b), a forfeiture action may be brought in any district court where any of the acts giving rise to the forfeiture occurred, even as to property located in a foreign jurisdiction. The criminal forfeiture statute, 18 U.S.C. § 982(b)(1), incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for a criminal forfeiture action. Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

## BACKGROUND ON RELEVANT CRYPTOCURRENCY ENTITIES AND CONCEPTS

### Cryptocurrencies and Transaction Analysis

12. Cryptocurrencies, also known as virtual currency, are not tied to any nation's fiat currency. Bitcoin (BTC) is a type of cryptocurrency. The owner of cryptocurrency is assigned a mathematical encryption key pair, consisting of a "public key" and a "private key," with which to control the currency they own. The public key is also known as an "address," is visible to the public, and allows members of the public to verify the owner of virtual currency and other information. Addresses are also used to send and receive cryptocurrency. Wallets are software programs that interface with blockchains and generate and/or store the public addresses and private keys used to send and receive cryptocurrency. A "wallet" can hold multiple addresses for a user, and an "account" can hold multiple wallets for a user. Users can transfer cryptocurrency into a wallet and the cryptocurrency may be housed in any of the addresses within the wallet. The private

key, also known as a "secret key," is essentially a password used to execute cryptocurrency transactions. Secret keys are typically only shared with the owner of the address.

13. Cryptocurrency transactions can have multiple inputs and multiple outputs. While the ownership of any particular address or wallet can be anonymous, all transactions of cryptocurrencies are recorded on a "blockchain," which is a series of "blocks" of transactions that establishes a verifiable, transparent record of the movement of virtual currency. Blockchains in this context are viewable by the public; they show all transactions, but do not reflect who owns a particular address. As cryptocurrency transactions are processed, they are assigned a unique identifier on the blockchain called a transaction hash.

14. Cryptocurrency exchanges exist and operate similarly to fiat currency exchanges. Customers use these exchanges to trade one form of digital currency for another, or to exchange digital currency into fiat money. In my training, knowledge, and experience, fraudsters will use cryptocurrency exchanges to launder or obfuscate their illicit gains.

15. Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, financial account information, including cryptocurrency wallets, is not typically shared across multiple, unrelated individuals. I also know that this shared use of information is very often the same person or a close and trusted group working in concert.

16. Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, I know that cryptocurrency can be laundered through multiple wallets and accounts in a manner that is similar to the laundering of fiat currency through different banks and bank accounts. However, with cryptocurrency the laundering transactions have the potential to be done in a faster and more efficient manner than through banking institutions. Fraudsters may attempt to obtain money from victims in the form of cryptocurrency because of its efficiency to be transferred

1:26-mj-01873-CJC

from the United States and laundered through cryptocurrency accounts maintained by people and fraudsters outside of the United States.

17. Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, I know that individuals engaged in criminal activity involving cryptocurrency frequently engage in "chain hopping," meaning that they convert funds from one cryptocurrency to another, in order to attempt to obscure the source of funds and make it more difficult to track illicit funds as they move from one blockchain to another.

<u>Tether</u>

18. **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

19. **Tether (USDT):** Tether Limited ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

## <u>PROBABLE CAUSE</u>

20. The Baltimore Field Office of the FBI is investigating a pig butchering scam that occurred from in or around May of 2025 through in or around September 2025, against a local victim ("A.K.") that resulted in the victim's loss of approximately $928,000.

21. A pig butchering scam is a type of investment fraud in which the victim is gradually convinced by the perpetrator to make purported investments. The victim often receives an initial text message that the perpetrator claims was sent in error or meets an individual through a social media service. Through social engineering techniques, the perpetrator begins talking to the victim,

1:26-mj-01873-CJC

gains their trust, and eventually convinces the victim to make a series of investments, usually in cryptocurrency. In reality, there is no investment, and the funds are simply kept by the perpetrator.

22. The instant seizure warrant pertains to approximately 810,000 worth of USDT obtained from multiple victims, including Maryland resident A.K.

23. A.K. resides in Anne Arundel County, in the District of Maryland. The communication with the unknown subject, who identified herself as "Karen Heard" ("Heard"), was then primarily conducted through WhatsApp. On or around May 20, 2025, Heard's initial WhatsApp message to A.K. read in part: "Hello [A.K.], this is karen on LinkedIN. I found you. But I'm not sure if this is you. Because your profile is different than on LinkedIN." A.K. responded "Its me. This is a picture with my gotee. I should up my LinkedIN picture."

24. Often, the perpetrators of pig butchering schemes market themselves to victims as experts in business and financial management when discussing cryptocurrency. Consistent with this, Heard introduced the concept of cryptocurrency investment and attempted to build trust with A.K. by stating in part on May 21, 2025:

> "Crypto is also an investment. It is hailed as digital gold and a safe haven asset. Its prospects are also good. What do you think? I am currently the CFO at Fortune Eye Data Analytics. My work focuses on financial operations, risk control, and developing data-driven strategies to support investment and business growth. We use predictive analytics and market models to guide decisions, especially in rapidly developing areas including fintech and emerging technologies. Our team is particularly focused on transparency and traceability of cross-border capital flows. This is still in the early stages, but very exciting. . . if you want to learn more, you can download Coinbase or Crypto.com."

25. On or about June 3, 2025, Heard begins to guide A.K. through the process of setting up a Coinbase account and sending funds to Heard for "investment" purposes. On the same day, Heard instructs A.K. to use an Onchain[1] wallet, telling A.K. "you can download the Crypto.com Onchain wallet from the App Store."

26. Heard guided A.K. through the browser function within the Onchain App and provided A.K. with a domain URL to input; https://www.defivip-finance.com/. Shortly thereafter, A.K. informed Heard, "I ["it" appears to be misspelled] takes me to vokwmb.top". Heard responds to A.K. stating "This is the futures trading platform I use." This appears to be the (fraudulent) platform that A.K. believed his funds were being invested.

27. A search of IC3[2] for the domain https://www.defivip-finance.com identified one additional victim based in Illinois who fell victim to a very similar fact pattern with a reported loss of approximately $48,000. Additionally, a search of IC3 for the domain vokwmb.top identified one additional individual based in California who fell victim to a crypto investment scheme with a reported loss of approximately $80,000.

28. On June 7, 2025, A.K. began to send funds to Heard at the fraudulent trading platform. A.K. stated to Heard "I was thinking $5000 until I get the additional funds. Is that enough?" In my training and experience with this type of scam, the unknown perpetrators have the victims invest a small amount of funds to build their confidence in the process.

29. In or around September 2025, A.K. attempted to withdraw funds from the investment platform. However, the perpetrators instructed A.K. he must pay $550,000 in 'fees'

[1] An Onchain wallet is a non-custodial cryptocurrency wallet that gives you complete control over your private keys and, therefore, your digital assets. Unlike custodial wallets (like those often found on centralized exchanges), a third party does not hold your funds or private keys, making you the sole custodian of your crypto.

[2] IC3 is a reporting mechanism to submit information to the Federal Bureau of Investigation concerning suspected cyber-facilitated criminal activity.

before he could withdraw funds.[3] A.K. became concerned that he may have fallen victim to a pig butchering scam, and even asked Heard "is it a Pig Butchering Scam[?]" Nevertheless, Heard then convinced A.K. to borrow money from his sister to come up with the withdrawal fees. According to A.K.'s Coinbase records, A.K. lost approximately $928,000 to this fraud scheme.

30. The FBI was able to identify and trace the fund movements stemming from several of A.K.'s initial deposits. This tracing led to the FBI identifying additional victims. A review of multiple transactions believed to be from multiple victims showed that funds initiated from Crytpo.com and Coinbase and moved across the blockchain through two Binance accounts held in the names of Lyu, Hao ("**HAO WALLET**") and Deng, Liangliang ("**DENG WALLET**"). Once the funds were laundered through one or both of the Binance accounts, the funds were sent to a wallet TDuSZmyysn1HvXgwhEvTkb5ujhksRnDQGD ("**MERGE WALLET**"). The **MERGE WALLET** appeared to be the repository for victim funds before they were sent to the **TARGET ADDRESSES**, controlled by the perpetrator(s). In my training and experience, the consistency of the victim details and the similar flow of victim funds across the blockchain establishes that this was all one criminal scheme to defraud. On or around November 4, 2025, Tether Limited voluntarily froze the balance of the **TARGET ADDRESSES**.

31. The approximate balance of funds held in each virtual currency address comprising the **TARGET ADDRESSES** is as follows:

- **TARGET ADDRESS 1** (110,011 **USDT**)
- **TARGET ADDRESS 2** (120,010 **USDT**)
- **TARGET ADDRESS 3** (120,000 **USDT**)
- **TARGET ADDRESS 4** (130,002 **USDT**)

---

[3] Often times in these scams, victims are often requested to pay "fees" to withdraw funds from their fraudulent investment accounts, when in reality this tactic is just another attempt to squeeze money from the victim.

1:26-mj-01873-CJC

- **TARGET ADDRESS 5** (110,0002 **USDT**)
- **TARGET ADDRESS 6** (110,002 **USDT**)
- **TARGET ADDRESS 7** (110,001 **USDT**)

.......................................................................................

*The following paragraphs trace a portion of victim funds identified to establish probable cause for the scheme to defraud and seizure of the **TARGET ADDRESSES**.*

.......................................................................................

**TRACING OF A.K. FUNDS**

32. Although A.K. appeared to send approximately $928,000.00 of cryptocurrency to these fraud perpetrators, investigators were only able to trace a portion of those funds, per below.

33. On August 25, 2025, funds in the amount of approximately $239,963 were sent across the blockchain, ultimately moving through the **DENG WALLET and HAO WALLET** and into the **MERGE WALLET**. The amounts shown below are approximate. The balance in each of the wallet addresses was approximately $0 prior to the funds being received.

***A.K. Transaction #1***




On August 1, 2025, a portion of the funds in the amount of approximately $216,980 was sent across the blockchain, ultimately moving through the **DENG WALLET** and into the **MERGE WALLET**. The amounts shown below are approximate. The balance in each of the wallet addresses was approximately $0 prior to the funds being received.

***A.K. Transaction #2***




From June 27, 2025 through June 28, 2025, funds in the amount of approximately $149,966 were sent across the blockchain, ultimately moving through the **HAO** and **DENG WALLET** and into the **MERGE WALLET**. The amounts shown below are approximate. The balance in each of the wallet addresses was approximately $0 prior to the funds being received.

***A.K. Transaction #3***

| WALLET LAST 6 DIGITS | AMOUNT | WALLET LAST 6 DIGITS |
|---|---|---|
| A.K. Coinbase Account | $149,966 | "...7640A2" |
| "...7640A2" | $149,966 | "...380aa0" |
| "...380aa0" | $149,966 | "...AF0194" |
| "...AF0194" | $150,485 | "...7e5e3D" |
| "...7e5e3D" | $30,000 | DENG WALLET |
| "...7e5e3D" | $70,000 | HAO WALLET |
| "...7e5e3D" | $45,505 | HAO WALLET |
| DENG WALLET | $30,399 | MERGE WALLET |
| HAO WALLET | $69,999 | MERGE WALLET |
| HAO WALLET | $45,399 | MERGE WALLET |

On July 8, 2025, a portion of the funds in the amount of approximately $104,978 was sent across the blockchain, ultimately moving through the **DENG WALLET** and into the **MERGE**

**WALLET.** The amounts shown below are approximate. The balance in each of the wallet addresses was approximately $0 prior to the funds being received, with the exception of wallet "aaccd02" that held a balance of approximately $40,000.

***A.K. Transaction #4***




**IDENTIFICATION OF ADDITIONAL VICTIMS C.G., D.M., T.F., J.P., J.S., and M.O. AND THE ASSOCIATED TRACING**

34. As previously described, cryptocurrency of the funds derived from A.K. resulted in the identification of the **TARGET ADDRESSES**. The **TARGET ADDRESSES** were identified as holding funds traceable to A.K. as well as other victims. Investigators performed additional

cryptocurrency tracing to identify these individuals and confirmed that they were victims of cryptocurrency investment schemes.

35. Investigators identified C.G., a victim located in Georgia. Based on an IC3 report filed, C.G. reported a loss of approximately $85,000 to a cryptocurrency investment scheme. C.G. met someone on a dating platform and communicated for approximately a month. The unknown female convinced C.G. that she was in love with him. The unknown female wanted to show C.G. how to make money in crypto and helped C.G. transfer funds into a Defi wallet. C.G. believed he was gaining profits from "node" trading. After C.G. was unable to come up with additional funds to put into the investment platform, he attempted to withdraw funds unsuccessfully. C.G. was told that he was required to pay taxes on profits to withdraw. Based upon my training, knowledge, and experience, I believe C.G. was a victim of a pig butchering scheme. Investigators were able to trace the following believed to be C.G.'s funds:

On September 6, 2025, funds in the amount of approximately $74,977 were sent across the blockchain, ultimately moving through the **DENG WALLET** and into the **MERGE WALLET**. The amounts shown below are approximate. The balance in each of the wallet addresses was approximately $0 prior to the funds being received.

1:26-mj-01873-CJC




36. Investigators identified D.M., a victim located in Florida. Based on an IC3 report filed, D.M. reported a loss of approximately $250,000. D.M. was contacted by a "Scarlett Breton" who led D.M. to believe crypto trades he made were to buy short term Bitcoin at a 15% return. D.M. reported that he was asked to pay $155,000 before his funds were released. Based upon my training, knowledge, and experience, I believe D.M. was a victim of a pig butchering scheme. Investigators were able to trace the following believed to be D.M.'s funds:

On July 2, 2025, funds in the amount of approximately $249,990 were sent across the blockchain, ultimately moving through the **DENG WALLET** and **HAO WALLET** and into the

**MERGE WALLET**. The amounts shown below are approximate. The balance in each of the wallet addresses was approximately $0 prior to the funds being received.

| WALLET LAST 6 DIGITS | AMOUNT | WALLET LAST 6 DIGITS |
|---|---|---|
| D.M. Crypto.com Account | $249,990 → | "...5ee41a" |
| "...5ee41a" | $249,990 → | "...92f81e" |
| "...92f81e" | $249,990 → | "...accd02" |
| "...accd02" | $120,000 → | HAO WALLET |
| "...accd02" | $129,990 → | DENG WALLET |
| HAO WALLET | $119,999 → | MERGE WALLET |
| DENG WALLET | $129,899 → | MERGE WALLET |

37. Investigators identified T.F., a victim located in Texas. T.F. reported he fell victim to multiple crypto scams. T.F. shared that he fell victim to a romance scam that initiated through a LinkedIn contact, which transitioned to WhatsApp and subsequently to Telegram. The unknown individual in communication with T.F. shared screenshots of substantial profits from trading. T.F. alleged that the investments were made through a wallet that looked like an Onchain wallet from Crypto.com. T.F. wanted to withdraw his funds from his investment, but was told he needed to pay taxes. Based upon my training, knowledge, and experience, I believe T.F. was a victim of a pig butchering scheme. Investigators were able to trace the following believed to be T.F.'s funds:

1:26-mj-01873-CJC

From July 11, 2025 through July 12, 2025, funds in the amount of approximately $446,852 were sent across the blockchain, ultimately moving through the **DENG WALLET** and the **HAO WALLET** and into the **MERGE WALLET**. The amounts shown below are approximate. The balance in each of the wallet addresses was approximately $0 prior to the funds being received.

| WALLET LAST 6 DIGITS | AMOUNT | WALLET LAST 6 DIGITS |
|---|---|---|
| T.F. Coinbase Account | $446,852 | "...308357" |
| "...308357" | $460,720 | "...174dF4" |
| "...174dF4" | $456,384 | "...D34bD3" |
| "...D34bD3" | $453,840 | "...4C453a" |
| "...4C453a" | $453,870 | "...2309f0" |
| "...2309f0" | $103,252 | HAO WALLET |
| "...2309f0" | $88,502 | DENG WALLET |
| "...2309f0" | $118,070 | DENG WALLET |
| "...2309f0" | $144,134 | HAO WALLET |
| HAO WALLET | $139,699 | MERGE WALLET |
| HAO WALLET | $102,999 | MERGE WALLET |
| DENG WALLET | $118,999 | MERGE WALLET |
| DENG WALLET | $118,999 | MERGE WALLET |

1:26-mj-01873-CJC

38. Investigators identified J.P., a victim located in Florida. J.P. w reported a loss of approximately $900,000. J.P. met a woman on WhatsApp named "Chloe Simmons." J.P. and "Chloe" began a relationship and she convinced J.P. to invest in cryptocurrency. J.P. was instructed to invest through Coinbase and eventually into a Crypto.com Onchain wallet. At some point in the process, J.P. attempted to retrieve his funds and was unable to withdraw his money. J.P. was instructed to deposit additional funds to retrieve his funds back. Based upon my training, knowledge, and experience, I believe J.P. was a victim of a pig butchering scheme. Investigators were able to trace the following believed to be J.P. funds:

On August 28, 2025, funds in the amount of approximately $185,566 were sent across the blockchain, ultimately moving through the **DENG WALLET** and the **HAO WALLET** and into the **MERGE WALLET**. The amounts shown below are approximate. The balance in each of the wallet addresses was approximately $0 prior to the funds being received.

1:26-mj-01873-CJC

| WALLET LAST 6 DIGITS | AMOUNT | WALLET LAST 6 DIGITS |
|---|---|---|
| J.P Coinbase Account | $185,566 → | "...667A1d" |
| "...667A1d" | $185,566 → | "...DFcA22" |
| "...DFcA22" | $185,565 → | "...258d4b" |
| "...258d4b" | $185,565 → | "...E8d483" |
| "...E8d483" | $185,565 → | "...701d1e" |
| "...701d1e" | $185,565 → | "...EDB3d1" |
| "...EDB3d1" | $185,565 → | "...30966A" |
| "...30966A" | $95,992 → | DENG WALLET |
| "...30966A" | $34,997 → | HAO WALLET |
| "...30966A" | $54,581 → | DENG WALLET |
| DENG WALLET | $95,992 → | MERGE WALLET |
| DENG WALLET | $54,499 → | MERGE WALLET |
| HAO WALLET | $41,805 → | MERGE WALLET |

1:26-mj-01873-CJC

39. Investigators identified J.S., a victim located in Indiana. J.S. was interviewed by investigators and reported a loss of approximately $3,000,000. J.S. had fallen into romantic relationships with multiple women and believed that he had met these unknown individuals through Facebook and misdirected texts. J.S. communicated with these unknown individuals through WhatsApp and Telegram. J.S. used Coinbase to convert funds to crypto. At some point after investing his funds, J.S. was required to pay additional amounts for various reasons. Based upon my training, knowledge, and experience, I believe J.S. was a victim of a pig butchering scheme. Investigators were able to trace the following believed to be J.S. funds:

From September 4, 2025 through September 5, 2025, funds in the amount of approximately $229,585 and $85,974 were sent across the blockchain, ultimately moving through the **DENG WALLET** and into the **MERGE WALLET**. The amounts shown below are approximate represent two transaction paths. The balance in each of the wallet addresses was approximately $0 prior to the funds being received.

***J.S. Transaction #1***

| WALLET LAST 6 DIGITS | AMOUNT | WALLET LAST 6 DIGITS |
|---|---|---|
| J.S. Coinbase Account | $229,585 → | "...DFcA22" |
| "...DFcA22" | $229,585 → | "...E8d483" |
| "...E8d483" | $234,945 → | "...701d1e" |

**balance of approximately $4,300 was in wallet "E8d483"*

| WALLET LAST 6 DIGITS | AMOUNT | WALLET LAST 6 DIGITS |
|---|---|---|
| "...701d1e" | $234,945 → | "...EDB3d1" |
| "...EDB3d1" | $234,945 → | "...30966A" |
| "...30966A" | $124,993 → | DENG WALLET |
| "...30966A" | $109,952 → | DENG WALLET |
| DENG WALLET | $109,914 → | MERGE WALLET |
| DENG WALLET | $124,950 → | MERGE WALLET |

1:26-mj-01873-CJC

***J.S. Transaction #2***

| WALLET LAST 6 DIGITS | AMOUNT | WALLET LAST 6 DIGITS |
|---|---|---|
| J.S. Coinbase Account | $85,974 | "...DFcA22" |
| "...DFcA22" | $85,974 | "...E8d483" |
| "...E8d483" | $85,974 | "...701d1e" |
| "...701d1e" | $85,974 | "...EDB3d1" |
| "...EDB3d1" | $85,977 | "...30966A" |
| "...30966A" | $85,986 | DENG WALLET |
| DENG WALLET | $85,999 | MERGE WALLET |

40. Investigators identified M.O.., a victim located in Colorado. M.O. reported a loss of approximately $250,000. It appears that M.O. was contacted by a Polish female who purported to live in Miami. M.O. was led to believe that the unknown female had a father knowledgeable in financial services. M.O. was convinced to invest funds; however, M.O. has been unable to recover funds that he deposited. M.O. was asked to pay taxes and become a "premium member." Based upon my training, knowledge, and experience, I believe M.O. was a victim of a pig butchering scheme. Investigators were able to trace the following believed to be M.O's funds:

1:26-mj-01873-CJC

On September 10, 2025, funds in the amount of approximately $132,961 were sent across the blockchain, ultimately moving through the **DENG WALLET** and into the **MERGE WALLET**. The amounts shown below are approximate. The balance in each of the wallet addresses was approximately $0 prior to the funds being received.

| WALLET LAST 6 DIGITS | AMOUNT | WALLET LAST 6 DIGITS |
|---|---|---|
| M.O. Crypto.com Account | $132,966 | "...Dbf824" |
| "...Dbf824" | $132,961 | "...bA8DaA" |
| "...bA8DaA" | $132,961 | "...5b9bfD" |
| "...5b9bfD" | $132,961 | "...5227DA" |
| "...5227DA" | $132,961 | "...43ABc7" |
| "...43ABc7" | $132,961 | "...2f845b" |
| "...2f845b" | $132,961 | "...1E7140" |
| "...1E7140" | $132,961 | DENG WALLET |
| DENG WALLET | $132,899 | MERGE WALLET |

**MOVEMENT FROM THE MERGE WALLET TO THE TARGET ADDRESSES**

41. From on or around July 4, 2025, through September 11, 2025, the FBI was able to identify funds moving from the **MERGE WALLET** to the **TARGET ADDRESSES** in the following amounts. The amounts below represent portions of the funds moved by victims as noted above:




42. Based on my training and experience, and the specific tracing of USDT obtained fraudulently by the unknown perpetrator(s) to the **TARGET ADDRESSES**, I believe that the funds in the **TARGET ADDRESSES** are proceeds of fraud. In addition, even if the source of some of the funds in the **TARGET ADDRESSES** cannot be conclusively shown, because the **TARGET ADDRESSES** contain fraud funds as well as unknown funds, and those funds having

passed through multiple addresses, your affiant respectfully submits that all funds in the **TARGET ADDRESSES** are involved in money laundering, and therefore all are subject to seizure.

**CONCLUSION**

43. This affidavit seeks seizure of the equivalent amount of USDT tokens currently associated with the **TARGET ADDRESSES**. Based on my training and experience, I know individuals engaged in fraud often move proceeds of criminal activity through multiple financial addresses, sometimes at a rapid pace, and often with no discernable legitimate purpose with the goal of concealing the true nature and source of the underlying funds. The tracing in this case demonstrates this; it shows the movement of the victims' funds, broken up and distributed through a series of transactions, without any apparent legitimate economic purpose, which implies the purpose of the transactions was to conceal the nature, source, location, ownership and control of the proceeds. *See*, e.g., *United States v. Rodriguez*, 53 F.3d 1439, 1447-48 (7th Cir. 1995) (convoluted real estate transactions, from which intent to conceal or disguise may be inferred, also imply knowledge of illegal source).

44. Based on the forgoing, I submit that there is probable cause to believe the funds held in the **TARGET ADDRESSES**, in any form, are proceeds of, or traceable to proceeds of wire fraud, in violation of 18 U.S.C. §1343, and/or are involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), are subject to criminal and civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 982(a)(1) and (2), and 28 U.S.C. § 2461(c).

1:26-mj-01873-CJC

45. Further, because the requested warrants would be executed by serving electronically to Tether Limited, I respectfully submit that there is good cause to permit the execution of the warrants at any time, day or night.

Special Agent James Maskell
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 20th day of July 2026.

The Honorable Chelsea J. Crawford
United States Magistrate Judge

## ATTACHMENT A: PROPERTY TO BE SEIZED

Pursuant to this warrant, Tether shall provide the law enforcement officer/agency serving this document with the equivalent amount of USDT tokens that are currently associated with the virtual currency address referenced below (i.e., up to and including the current approximate balance of 810,000 USDT for the **TARGET ADDRESSES**). Tether shall effectuate this process by (1) burning the USDT tokens currently associated with the virtual currency address referenced below and (2) reissuing the equivalent value of USDT tokens to a U.S. law enforcement-controlled virtual currency wallet. Tether shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate its implementation.

TTACZx1BQEj2wVhXdKe6zGorKqS1EjE72A **(TARGET ADDRESS 1)**

TJA2KjVzL2ixWQzci7Zr8zMzouWtHJo9pz **(TARGET ADDRESS 2)**

TWgzbUbt8g4ZnFHh7mjnuR4d8f5HzSdDUF **(TARGET ADDRESS 3)**

TDJkmbe8NrWw2wuhdhQEfyLJvvpmGksZWi **(TARGET ADDRESS 4)**

TB7rxSjL7cTfJyQeddcmubhSt7goVW7PH6 **(TARGET ADDRESS 5)**

TPo1J3QdoL3PbWpnZXXGav8nGiQEyCAAKg **(TARGET ADDRESS 6)**

TRBDo4QmH31jtFntNAb7aHvSsmm67QD422 **(TARGET ADDRESS 7)**